# EXHIBIT A

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

JAMES MCINTIRE, Individually and on
Behalf of All Others Similarly Situated,

              Plaintiff,

      vs.

ALLY FINANCIAL INC., MICHAEL A.
CARPENTER, CHRISTOPHER A. BALMY,
DAVID J. DEBRUNNER, ROBERT T.
BLAKELY, MAYREE C. CLARK,
STEPHEN A. FEINBERG, KIM S.
FENNEBRESQUE, GERALD
GREENWALD, FRANKLIN W. HOBBS,
BRIAN P. MACDONALD, MARJORIE
MAGNER, HENRY S. MILLER, MATTHEW
PENDO, CITIGROUP GLOBAL MARKETS
INC., GOLDMAN, SACHS & CO.,
MORGAN STANLEY & CO. LLC,
BARCLAYS CAPITAL INC., MERRILL
LYNCH, PIERCE, FENNER & SMITH
INCORPORATED, DEUTSCHE BANK
SECURITIES INC., J.P. MORGAN
SECURITIES LLC, SANDLER O'NEILL &
PARTNERS, L.P., KEEFE, BRUYETTE &
WOODS, INC., CREDIT SUISSE
SECURITIES (USA) LLC, EVERCORE
GROUP L.L.C., RBC CAPITAL MARKETS,
LLC, SCOTIA CAPITAL (USA) INC.,
CREDIT AGRICOLE SECURITIES (USA)
INC., RAYMOND JAMES & ASSOCIATES,
INC., SG AMERICAS SECURITIES, LLC,
GUGGENHEIM SECURITIES, LLC,
SANFORD C. BERNSTEIN & CO., LLC,
GLOBAL HUNTER SECURITIES, LLC,
HEIGHT SECURITIES, LLC, JMP
SECURITIES LLC, LOOP CAPITAL
MARKETS LLC, BLAYLOCK BEAL VAN,
LLC, CASTLEOAK SECURITIES, L.P.,
MISCHLER FINANCIAL GROUP, INC.,
THE WILLIAMS CAPITAL GROUP, L.P.,
C.L. KING & ASSOCIATES, INC.,

Case No.       -CZ

17-003811-CZ
FILED IN MY OFFICE
WAYNE COUNTY CLERK
3/2/2017 4:30:08 PM
CATHY M. GARRETT

**CLASS ACTION
COMPLAINT AND
DEMAND
FOR JURY TRIAL**

LEBENTHAL & CO., LLC, MFR
SECURITIES, INC., SAMUEL A. RAMIREZ
& COMPANY, INC., DREXEL HAMILTON,
LLC, MURIEL SIEBERT & CO., INC.,
TELSEY ADVISORY GROUP LLC,
TOUSSAINT CAPITAL PARTNERS, LLC,
ACADEMY SECURITIES INC., FREEMAN
& CO. SECURITIES LLC, and WM SMITH
& CO.,

                    Defendants.

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE SECURITIES ACT OF 1933

> There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge.

By:    /s/ David H. Fink
       David H. Fink (P28235)
       Attorney for Plaintiff

Plaintiff James McIntire ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Ally Financial Inc. ("Ally" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Ally; and (c) review of other publicly available information concerning Ally.

## SUMMARY OF THE ACTION

1.     This is a class action on behalf of persons and/or entities who purchased or otherwise obtained shares of the Company's common stock pursuant and/or traceable to the Company's false and/or misleading registration statement and prospectus (collectively, the "IPO Registration Statement") issued in connection with the Company's April 2014 initial public

offering (the "IPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      Ally is a financial services firm. The Company operates as a financial holding company ("FHC") and a bank holding company ("BHC"). Ally's subsidiary, Ally Bank, is an indirect, wholly-owned subsidiary of Ally. Ally's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ALLY."

3.      On or around April 11, 2014, Ally conducted the Offering, selling  95,000,000 shares of common stock at a price of $25 per share.

4.      On October, 31, 2014, the Company disclosed that it had received subpoenas and document requests from the SEC, covering a wide range of mortgage-related matters, including those related to subprime automotive finance and securitization activities. The Company also disclosed that that it had received subpoenas from the U.S. Department of Justice ("DOJ"), that included a broad request for documentation and other information in connection with its investigations of "potential fraud and other potential legal violations related to mortgage-backed securities, as well as the origination and/or underwriting of mortgage loans."

5.      On December 18, 2014, the Company disclosed that it received a subpoena from the DOJ requesting information in connection with its investigation into "subprime automotive finance and related securitization activities."

6.      The IPO Registration Statement was materially false and misleading and/or omitted to state: (1) that subprime auto loan delinquency rates were significantly increasing; (2) that the Company's underwriting practices for the origination of its subprime auto loans were inadequate; (3) that aggressive tactics were being used on low-income borrowers (for example, pushing borrowers to limits beyond what they can afford by falsifying income); and (5) that, as a result of

the foregoing, Defendants' statements in the IPO Registration Statement regarding Ally's business, operations, and prospects, were materially false and/or misleading.

7.    On October 29, 2015, Ally reported a 37% decline in third quarter 2015 net income compared to the third quarter of 2014.  Chief Financial Officer ("CFO"), Christopher Halmy, said the deterioration reflected a decision by Ally to take on riskier loans. On this news, Ally shares fell $0.85 per share, or 4.1%.

8.    On June 2, 2016, the *Wall Street Journal* published an article entitled "J.P. Morgan Chief James Dimon Sounds Alarm on Car Loans." The article stated that "Mr. Dimon . . . see[s] increased risk due to higher default rates from increased subprime lending.

9.    On the next day, June 3, 2016, an *Automotive News* article reported that Ally CEO Jeffrey Brown stated that Ally is dialing back on lending to consumers at the lower end of the subprime credit score spectrum. The article also stated that "[e]xecutives at some of the biggest banks in auto lending . . . [are] tapping the brakes on subprime lending, especially at the lower end of the credit spectrum." On this news, Ally shares fell $0.82 per share, or 4.4%, to close at $17.69 per share on June 3, 2016.

10.    Then on June 14, 2016, the *Wall Street Journal* published an article entitled "Credit-Card Warning Sends Synchrony Shares Dropping." The article stated that "auto loans . . . are weakening, suggesting that a new round of borrower delinquencies and losses for financial institutions could be on the way." On this news, Ally shares fell $0.95 per share, or 5.5%, to close at $16.08 per share on June 14, 2016.

11.    On July 11, 2016, *CNN Money* published an article entitled "U.S. government worried about risky car loans." The article stated that "[a] top banking regulator warned that the $1 trillion car loan industry has gotten more dangerous," and that "[t]he Office of the Comptroller

of the Currency cited 'unprecedented' growth in auto loans, rising delinquencies and shrinking

used car values" and "pointed to cutthroat competition among banks, which has led them to relax

underwriting standards."

      12.     On July 28, 2016, the *Wall Street Journal* published an article entitled "Alarm Bells

for Auto Loans," stating, in pertinent part:

> Four of the largest auto lenders by loan volume - Ally Financial, Wells Fargo, J.P.
> Morgan Chase and Capital One Financial - said on second-quarter earnings calls
> that used-cars prices are at risk of falling. Ally's finance chief Christopher Halmy
> this week said pressure on used-car prices could grow as cars getting leased now
> return to the market in three years.
>
> Declining values would be an additional issue for the auto-loan industry, where
> default expectations for subprime loans are rising. Ally's Mr. Halmy said the cars
> getting leased today are "the biggest concern" for used-car prices. He added that
> used-car prices have held up better than expected so far.

      13.     As a result of Defendants' acts and omissions, and the precipitous decline in the

market value of the Company's securities, Plaintiff and other Class members have suffered

significant losses and damages.

## JURISDICTION AND VENUE

      14.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and

15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77(o)). This Court has jurisdiction over

the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v,

which explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title

and brought *in any State court* of competent jurisdiction shall be removed to any court in the

United States." (Emphasis added.) Section 16(c) of the Securities Act refers to "covered class

actions," which are defined as lawsuits brought as class actions or brought on behalf of more than

fifty persons asserting claims *under state or common law*. This is an action asserting federal law

6

claims.  Thus, it does not fall within the definition of a "covered class action" under §16(c) and therefore is not removable to federal court under the Securities Litigation Uniform Standards Act of 1998.

16. Each Defendant has sufficient contacts with Michigan, or otherwise purposefully avails themselves of benefits from Michigan or has property in Michigan so as to render the exercise of jurisdiction over each by the Michigan courts consistent with traditional notions of fair play and substantial justice.

16. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

17. Venue is proper in this Court pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v. Many of the violations of law complained of herein occurred in this State and in this County, including the dissemination of the materially false and misleading statements complained of herein into this State and into this County.  In addition, Ally's principal executive offices are located in this State.

## PARTIES

18. Plaintiff James McIntire purchased Ally securities pursuant and/or traceable to the IPO Registration Statement issued in connection with the Company's IPO and has been damaged thereby.

19. Defendant Ally is incorporated in Delaware and its principal executive offices are located in Detroit, Michigan. Ally's common stock trades on the NYSE under the ticker symbol "ALLY."

7

20.    Defendant Michael A. Carpenter ("Carpenter") was the Company's Chief Executive Officer ("CEO") and a director of the Company. Defendant Carpenter signed, or authorized the signing of, the IPO Registration Statement.

21.    Defendant Christopher A. Halmy ("Halmy") is the Company's CFO. Halmy signed, or authorized the signing of, the IPO Registration Statement.

22.    Defendant David J. Debrunner ("Debrunner") is a Vice President, Chief Accounting Officer, and Corporate Controller of the Company. Defendant Debrunner signed, or authorized the signing of, the IPO Registration Statement.

23.    Defendant Robert T. Blakely ("Blakely") is a director of the Company. Defendant Blakely signed, or authorized the signing of, the IPO Registration Statement.

24.    Defendant Mayree C. Clark ("Clark") is a director of the Company. Defendant Clark signed, or authorized the signing of, the IPO Registration Statement.

25.    Defendant Stephen A. Feinberg ("Feinberg") was a director of the Company. Defendant Feinberg signed, or authorized the signing of, the IPO Registration Statement.

26.    Defendant Kim S. Fennebresque ("Fennebresque") is a director of the Company. Defendant Fennebresque signed, or authorized the signing of, the IPO Registration Statement.

27.    Defendant Gerald Greenwald ("Greenwald") was a director of the Company. Defendant Greenwald signed, or authorized the signing of, the IPO Registration Statement.

28.    Defendant Franklin W. Hobbs ("Hobbs") is a director of the Company. Defendant Hobbs signed, or authorized the signing of, the IPO Registration Statement.

29.    Defendant Brian P. MacDonald ("MacDonald") was a director of the Company. Defendant MacDonald signed, or authorized the signing of, the IPO Registration Statement.

8

30.     Defendant Marjorie Magner ("Magner") is a director of the Company. Defendant Magner signed, or authorized the signing of, the IPO Registration Statement.

31.     Defendant Henry S. Miller ("Miller") was a director of the Company.  Defendant Miller signed, or authorized the signing of, the IPO Registration Statement.

32.     Defendant Mathew Pendo ("Pendo") was a director of the Company.  Defendant Pendo signed, or authorized the signing of, the IPO Registration Statement.

33.     Defendants Carpenter, Halmy, Debrunner, Blakely, Clark, Feinberg, Fennebresque, Greenwald, Hobbs, MacDonald, Magner, Miller, and Pendo are collectively referred to hereinafter as the "Individual Defendants."

34.     Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter for the Offering. In the Offering, Citigroup agreed to purchase 14,725,000 Ally shares.

35.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") was an underwriter for the Offering. In the Offering, Goldman Sachs agreed to purchase 14,725,000 Ally shares.

36.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the Offering. In the Offering, Morgan Stanley agreed to purchase 14,725,000 Ally shares.

37.     Defendant Barclays Capital Inc. ("Barclays") was an underwriter for the Offering. In the Offering, Barclays agreed to purchase 14,725,000 Ally shares.

38.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter for the Offering. In the Offering, Merrill Lynch agreed to purchase 4,845,000 Ally shares.

39.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter for the Offering. In the Offering, Deutsche Bank agreed to purchase 4,845,000 Ally shares.

40.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the Offering. In the Offering, J.P. Morgan agreed to purchase 4,845,000 Ally shares.

41.     Defendant Sandler O'Neill & Partners, L.P. ("Sandler O'Neill") was an underwriter for the Offering. In the Offering, Sandler O'Neill agreed to purchase 2,945,000 Ally shares.

42.     Defendant Keefe, Bruyette & Woods, Inc. ("Keefe") was an underwriter for the Offering. In the Offering, Keefe agreed to purchase 2,185,000 Ally shares.

43.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter for the Offering. In the Offering, Credit Suisse agreed to purchase 1,377,500 Ally shares.

44.     Defendant Evercore Group L.L.C. ("Evercore") was an underwriter for the Offering. In the Offering, Evercore agreed to purchase 2,185,000 Ally shares.

45.     Defendant RBC Capital Markets, LLC ("RBC") was an underwriter for the Offering. In the Offering, RBC agreed to purchase 2,185,000 Ally shares.

46.     Defendant Scotia Capital (USA) LLC ("Scotia") was an underwriter for the Offering. In the Offering, Scotia agreed to purchase 1,377,500 Ally shares.

47.     Defendant Credit Agricole Securities (USA) Inc. ("Credit Agricole") was an underwriter for the Offering. In the Offering, Credit Agricole agreed to purchase 855,000 Ally shares.

48.     Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter for the Offering. In the Offering, Raymond James agreed to purchase 855,000 Ally shares.

49.     Defendant SG Americas Securities, LLC ("SG Americas") was an underwriter for the Offering. In the Offering, SG Americas agreed to purchase 855,000 Ally shares.

50.     Defendant Guggenheim Securities, LLC ("Guggenheim") was an underwriter for the Offering. In the Offering, Guggenheim agreed to purchase 665,000 Ally shares.

51.     Defendant Sanford C. Bernstein & Co., LLC ("Sanford") was an underwriter for the Offering. In the Offering, Sanford agreed to purchase 665,000 Ally shares.

52.     Defendant Global Hunter Securities ("Global Hunter") was an underwriter for the Offering. In the Offering, Global Hunter agreed to purchase 665,000 Ally shares.

53.     Defendant Height Securities, LLC ("Height") was an underwriter for the Offering. In the Offering, Height agreed to purchase 475,000 Ally shares.

54.     Defendant JMP Securities LLC ("JMP") was an underwriter for the Offering. In the Offering, JMP agreed to purchase 475,000 Ally shares.

55.     Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter for the Offering. In the Offering, Loop Capital agreed to purchase 475,000 Ally shares.

56.     Defendant Blaylock Beal Van, LLC ("Blaylock") was an underwriter for the Offering. In the Offering, Blaylock agreed to purchase 308,750 Ally shares.

57.     Defendant CastleOak Securities, L.P. ("CastleOak") was an underwriter for the Offering. In the Offering, CastleOak agreed to purchase 285,000 Ally shares.

58.     Defendant Mischler Financial Group, Inc. ("Mischler") was an underwriter for the Offering. In the Offering, Mischler agreed to purchase 285,000 Ally shares.

59.     Defendant The Williams Capital Group, L.P. ("Williams Capital") was an underwriter for the Offering. In the Offering, Williams Capital agreed to purchase 285,000 Ally shares.

60.     Defendant C.L. King & Associates, Inc. ("C.L. King") was an underwriter for the Offering. In the Offering, C.L. King agreed to purchase 237,500 Ally shares.

11

61.     Defendant Lebenthal & Co., LLC ("Lebenthal") was an underwriter for the Offering. In the Offering, Lebenthal agreed to purchase 237,500 Ally shares.

62.     Defendant MFR Securities, Inc. ("MFR") was an underwriter for the Offering. In the Offering, M FR agreed to purchase 237,500 Ally shares.

63.     Defendant Samuel A. Ramirez & Company, Inc. ("Samuel Ramirez") was an underwriter for the Offering. In the Offering, Samuel Ramirez agreed to purchase 237,500 Ally shares.

64.     Defendant Drexel Hamilton, LLC ("Drexel") was an underwriter for the Offering. In the Offering, Drexel agreed to purchase 190,000 Ally shares.

65.     Defendant Muriel Siebert & Co., Inc. ("Muriel Siebert") was an underwriter for the Offering. In the Offering, Muriel Siebert agreed to purchase 190,000 Ally shares.

66.     Defendant Telsey Advisory Group LLC ("Telsey") was an underwriter for the Offering. In the Offering, Telsey agreed to purchase 190,000 Ally shares.

67.     Defendant Toussaint Capital Partners, LLC ("Toussaint Capital") was an underwriter for the Offering. In the Offering, Toussaint Capital agreed to purchase 190,000 Ally shares.

68.     Defendant Academy Securities Inc. ("Academy") was an underwriter for the Offering. In the Offering, Academy agreed to purchase 166,250 Ally shares.

69.     Defendant Freeman & Co. Securities LLC ("Freeman") was an underwriter for the Offering. In the Offering, Freeman agreed to purchase 142,500 Ally shares.

70.     Defendant Wm Smith & Co. ("Wm Smith") was an underwriter for the Offering. In the Offering, Wm Smith agreed to purchase 142,500 Ally shares.

71.    Defendants Citigroup, Goldman Sachs, Morgan Stanley, Barclays, Merrill Lynch, Deutsche Bank, J.P. Morgan, Sandler O'Neill, Keefe, Credit Suisse, Evercore, RBC, Scotia, Credit Agricole, Raymond James, SG Americas, Guggenheim, Sanford, Global Hunter, Height, JMP, Loop Capital, Blaylock, CastleOak, Mischler, Williams Capital, C.L. King, Lebenthal, MFR, Samuel Ramirez, Drexel, Muriel Siebert, Telsey, Toussaint Capital, Academy, Freeman and Wm Smith are referred to collectively herein as the "Underwriter Defendants." The Underwriter Defendants each served as a financial advisor for, and assisted in the preparation and dissemination of, the Company's materially untrue and misleading Registration Statement and Prospectus.

72.    The Underwriter Defendants are primarily investment banking houses which specialize, *inter alia,* in underwriting public offerings of securities. As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

73.    Representatives of the Underwriter Defendants also assisted the Company and Individual Defendants in planning the Offering. They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

74.    In addition to having unlimited access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what

13

disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with their review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants were negligent in not knowing of the Company's undisclosed existing problems and plans and the materially untrue statements and omissions contained in the Registration Statement, as detailed herein.

75.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the offer and sales of the Company's shares pursuant and/or traceable to the Offering and relevant offering materials, including to Plaintiff and the Class (defined below).

76.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the untrue and misleading statements in the Offering's Registration Statement and Prospectus. The Underwriter Defendants' negligent due diligence investigation was a substantial factor leading to the harm complained of herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action as a class action on behalf of a Class consisting of all persons and/or entities who purchased or otherwise acquired the ordinary shares of Ally pursuant and/or traceable to the Company's false and/or misleading registration statement and prospectus issued in connection with the Company's IPO, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company or its related

14

entities, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

78.     The members of the Class are so numerous that joinder of all members is impracticable. During the relevant period, Ally's securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. The Company sold approximately 95 million shares in the IPO. Moreover, record owners and other members of the Class may be identified from records maintained by Ally or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants wrongful conduct in violation of federal law that is complained of herein.

80.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

81.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public in connection with the Company's IPO omitted and/or misrepresented material facts about the business, operations, and prospects of Ally; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**I.      ALLY FINANCIAL INC.**

83.     Ally operates as a financial holding company, primarily focused on providing financing within the automotive industry. The Company provides auto financing through a network of over 17,500 dealerships, and Ally also owns a consumer banking division, Ally Bank. Formerly known as GMAC, and once majority-owned by US taxpayers following a federal bailout in 2008, Ally went public in 2014.

**II.     The Company's False and/or Misleading IPO Registration Statement**

84.     On or around April 11, 2014, Ally sold 95,000,000 shares of Ally common stock at a price of $25 per share. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts, or omitted to state the facts necessary to make the statements not misleading, and was not prepared in accordance with the rules and regulations governing its preparation. The Company's Registration Statement, and Prospectus incorporated therein, presented a highly positive picture of the Company's business, performance, prospects, and products, while omitting crucial facts and known trends.

85.     The Company stated the following in its Registration Statement regarding its underwriting policies and credit risk management, in pertinent part:

**Credit Risk Management**

Credit risk is defined as the potential failure to receive payments when due from an obligor in accordance with contractual obligations. Therefore, credit risk is a major Source of potential economic loss to us. Credit risk is monitored by enterprise and line of business committees and the Enterprise Risk Management organization. Together they oversee the credit deaccessioning and management processes, and monitor credit risk exposures to ensure they are managed in a safe and- sound manner and are within our risk appetite. In addition, our Loan Review Group provides an independent assessment of the quality of our credit portfolios and credit risk management practices, and directly reports its findings to the Risk and Compliance Committee of the Board on a regular basis.

To mitigate risk, we have implemented specific policies and practices across all lines of business, utilizing both qualitative and quantitative analyses, that reflect our commitment to maintain an independent and ongoing assessment of credit risk and credit quality. Our policies require an objective and timely assessment of the overall quality of the consumer and commercial loan and lease portfolios. This includes the identification of relevant trends that affect the collectability of the portfolios, segments of the portfolios that are potential problem areas, loans and leases with potential credit weaknesses, as well as stress testing and the assessment of the adequacy of internal credit risk policies and procedures to monitor compliance with relevant laws and regulations. In addition, we maintain limits and underwriting policies that reflect our risk appetite.

We manage credit risk based on the risk profile of the borrower, the source of repayment, the underlying collateral, and current market conditions. We monitor the credit risk profile of individual borrowers and the aggregate portfolio of borrowers either within a designated geographic region or a particular product or industry segment. We perform ongoing analyses of the consumer automobile, consumer mortgage, and commercial portfolios using a range of indicators to assess the adequacy of the allowance based on historical and current trends.

86.     The Company stated the following in its Registration Statement regarding its expansion in nonprime automotive lending, in relevant part:

Within our Automotive Finance operations, we are a full spectrum automotive finance lender with most of our loan originations underwritten within the prime lending markets. During 2013, we continued the execution of our underwriting strategy to prudently expand our originations across a broader credit spectrum to include used, nonprime, extended term, non-GM, non-Chrysler, and non-subverted. Within our Mortgage operations, we sold our business lending operations to Walter

Investment Management Corp., completed the sales of agency MSRs to Ocwen and Quicken, and exited the correspondent and direct lending channels. Our ongoing Mortgage operations are limited to the management of our held-for-investment mortgage portfolio. In the future, we may purchase mortgage loans as part of our held-for-investment mortgage portfolio.

87.     The above statements were materially untrue and misleading and omitted material information because, upon information and belief, at the time of the Offering, the Company failed to disclose: (1) that subprime auto loan delinquency rates were rising; (2) the Company employed ineffective underwriting practices in the origination of its auto loans; (3) aggressive sales practices pushed subprime loans onto low-income borrowers;.

88.     In addition, pursuant to Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto, including any known trends, issuers are required to disclose events or uncertainties that have had, or are reasonably likely to cause, the registrant's financial information not to be indicative of future operating results. Any adverse events and/or uncertainties associated with demand for its products were reasonably likely to have a material impact on Ally's profitability and therefore, were required to be (but were not) disclosed in the Registration Statement under Item 303.

### Disclosures Subsequent to the IPO

89.     On October 29, 2015, Ally published a press release reporting third quarter 2015 financial results. Therein, the Company reported net income of $268 million, a 37% year over year compared to third quarter 2014.

90.     On the same day, Defendant Halmy reported to investors that the decline in profitability resulted from Ally's decision to underwrite riskier loans, however, Defendant Halmy also noted that credit was performing as expected, stating we are, "seeing no real credit trends that are disturbing."

18

91.     On this news, Ally shares fell over 4%.

92.     On June 2, 2016, after the market closed, the *Wall Street Journal* published an article entitled "J.P. Morgan Chief James Dimon Sounds Alarm on Car Loans." The article reported on the expansion of financing companies into a risky market of subprime auto loans, stating in relevant part:

> The auto-loan market is fragmented. The largest 20 lenders represented about 49% of car loans given out in the fourth quarter, according to Experian. Ally Financial Inc. and Wells Fargo & Co. are the two largest, each accounting for about 5.7% of car loans given out in the fourth quarter.
>
> Ally's CEO, Jeffrey Brown, played down risks among the company's auto borrowers. "Our auto finance business is doing great and putting on better risk adjusted returns," he said at the Thursday investment conference. "We know fully what we are originating ... there are no skeletons in the closet."

93.     On the next day, June 3, 2016, an *Automotive News* article reported that Defendant Brown disclosed troubling developments in the subprime auto lending market, and that Ally needed to limit its exposure to subprime loans.

94.     On this news, Ally shares fell from $18.51 per share, on June 2, to $17.69 per share on June 3, a drop of over 4.43%.

95.     Over the course of June and July 2016, news reports continued to expose Ally's deep exposure to subprime loans, and how the entire subprime market was underperforming due to shoddy underwriting practices, and declining assets prices.

96.     Following each of these disclosures the Company's stock price declined sharply in value.

19

### FIRST CLAIM
### Violations of § 11 of the Securities Act
### Against All Defendants

97.     Plaintiff repeats and realleges each and every allegation contained above, except any allegation of fraud, recklessness or intentional misconduct.

98.     This Claim is brought pursuant to §11 of the Securities Act, 15 U .S.C. §77k, on behalf of the Class, against all of the Defendants.

99.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

100.    As issuer of the shares, Ally is strictly liable to Plaintiff and the Class for the misstatements and omissions.

101.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Registration Statement were true and without omissions of any material facts and were not misleading.

102.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

103.    Plaintiff acquired Ally shares pursuant and/or traceable to the IPO Registration Statement.

104.    Plaintiff and the Class have sustained damages.  The value of Ally ordinary shares has declined substantially subsequent to, and due to, Defendants' violations.

105.    The Underwriter Defendants each served as underwriters in connection with the Offering. As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate,

20

unless they are able to carry their burden of establishing an affirmative "due diligence" defense. These Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that they were (rue and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

106.   By reason of the conduct herein alleged, each Defendant violated §11 of the Securities Act.

## SECOND CLAIM
### Violations of § 12(a)(2) of the Securities Act
### Against All Defendants

107.   Plaintiff repeats and realleges each and every allegation contained above, except any allegation of fraud, recklessness or intentional misconduct.

108.   This Claim is brought pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. §771 (a)(2), on behalf of the Class, against each of the Defendants.

109.   Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's securities offered pursuant to the Offering. Defendants issued, caused to be issued, and signed the Registration Statement in connection with the Offering. The Registration Statement was used to induce investors, such as Plaintiff and the other members of the Class, to purchase the Company's shares.

21

110.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. Defendants' acts of solicitation included participating in the preparation of the materially untrue and incomplete Registration Statement.

111.    As set forth more specifically above, the Registration Statement contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

112.    Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement.

113.    The Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

114.    This Claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years after the Company's shares were sold to the Class in connection with the Offering.

### THIRD CLAIM
### Violations of § 15 of the Securities Act
### Against the Individual Defendants

115.    Plaintiff repeats and realleges each and every allegation contained above, except any allegation of fraud, recklessness or intentional misconduct.

22

116. This Claim is asserted against the Individual Defendants brought pursuant to §15 of the Securities Act.

117. Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Ally within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause Ally to engage in the acts described herein.

118. Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

119. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action and certifying Plaintiff as Class Representative;

B. Awarding Plaintiff and the other members of the Class compensatory damages;

C. Awarding Plaintiff and the other members of the Class rescission on their § 12(a)(2) claims;

D. Awarding Plaintiff and the other members of the Class pre-judgment and post judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E. Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 2, 2017

**FINK + ASSOCIATES LAW**

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Schuyler von Oeyen (P74048)
38500 Woodward Ave., Suite 350
Bloomfield Hills, MI 48304
Telephone: 248-971-2500
Facsimile: 248-971-2600
Email: dfink@finkandassociateslaw.com
        dbressack@finkandassociateslaw.com
        svonoeyen@finkandassociateslaw.com


**GLANCY PRONGAY & MURRAY LLP**

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email: rprongay@glancylaw.com


*Attorneys for Plaintiff*